**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS WOODWARD, and MADISON WOODWARD III, <br><br>     Plaintiffs, <br> v. <br><br> AMANDA LEFTON, in her official capacity as Commissioner of the New York Department of Environmental Conservation; CATHERINE DICKERT, in her official capacity as Director of the New York Department of Environmental Conservation's Division of Mineral Resources; and LETITIA JAMES, in her official capacity as Attorney General of the State of New York, <br><br>     Defendants. | **Civil Action No.** 3:26-CV-0736 (AJB/CBF) <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. Plaintiffs Thomas Woodward and Madison Woodward III (together, the Woodwards) bring this Fifth Amendment takings challenge to New York's comprehensive ban on high-volume hydraulic fracturing, carbon dioxide (CO2) fracturing, and propane gel fracturing, which prohibits all commercially viable methods of extracting natural gas from the Marcellus and Utica Shale formations underlying their property in Delaware County, New York. N.Y. Env't Conserv. Law (ECL) § 23-0501.

2. The Woodwards are a father and son who purchased 164 acres of property, including the mineral rights, near Sidney, New York, in 2011. This purchase was based on informed analysis and reasonable investment-backed expectations that they would be allowed to develop the valuable natural gas resources

1

beneath their property. Madison Woodward III evaluated the property and confirmed that it sits in a dry-gas fairway with favorable geologic characteristics suggesting significant resource potential.

3. New York sits atop some of the nation's most productive natural gas reserves—the Marcellus and Utica Shale formations. These formations extend across the border into Pennsylvania, where they have been developed safely and extensively for over fifteen years, generating substantial income for mineral rights owners, creating jobs, and contributing to American energy security and national security.

4. Rather than allow responsible development of these natural resources, New York has slowly tightened the noose on property rights and energy freedom. In 2008, the New York State Department of Environmental Conservation (DEC) started an environmental review of high-volume hydraulic fracturing under the State Environmental Quality Review Act, which prevented DEC from issuing permits during the environmental review process. This de facto moratorium dragged on until 2015, when DEC finished its review and concluded that it had to refuse to issue any permits for high-volume hydraulic fracturing. In 2020, the legislature turned that agency action into a statutory ban on high-volume hydraulic fracturing. § 23-0501(3)(a).

5. Likewise, the statutory ban imposed an indefinite moratorium on propane gel fracturing "until the department completes an analysis of the potential impacts of gelled propane fracturing and makes the analysis publicly available." § 23-0501(3)(b). The statute does not include any deadline for completing the required analysis and the moratorium currently remains in place six years later.

6. In December 2024, Governor Hochul signed legislation expanding the ban to also include CO2-based fracturing methods. § 23-0501(3)(a).

7. High-volume hydraulic fracturing is the only commercially viable method of extracting natural gas from the Marcellus and Utica Shale formations.

Conventional drilling without fracturing stimulation is commercially impracticable due to the extremely low permeability of shale rock.

8.   New York has long recognized mineral rights as severable, and thus a separate and independent estate from the surface estate. *See White v. Miller*, 78 Misc. 428 (N.Y. Sup. Ct. 1912); *Armstrong v. Lake Champlain Granite Co.*, 147 N.Y. 495 (1895). The Woodwards own only the mineral estate underlying their 164 acres in Delaware County, having severed and retained those rights when they sold the surface in 2019. That mineral estate has one function: extraction of the natural gas beneath it. New York's comprehensive ban on every viable extraction method renders their mineral rights economically useless.

9.   By prohibiting every commercially viable method of extraction, New York forces the Woodwards to leave their mineral estate economically idle without any form of compensation. This amounts to a total taking of private property that violates the Fifth Amendment.

10.   By prohibiting the commercially viable methods of fracturing to extract natural gas, New York unfairly requires property owners to bear the burden of the State's environmental policies. *See Pa. Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922) (Holmes, J.) ("We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.").

11.   The Woodwards are among those whose property rights have been sacrificed to absorb the costs of the State's environmental policy. A complete ban on the commercially viable methods of gas extraction must be enjoined because, like the restriction on coal mining that amounted to a taking in *Pennsylvania Coal Co.*, it "goes too far." *Id.* at 415.

## JURISDICTION AND VENUE

12.     This action arises under the Fifth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment. This Court has jurisdiction through 42 U.S.C. § 1983 and 28 U.S.C. § 1331. Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

13.     Under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity does not bar actions against state officials seeking prospective injunctive relief against ongoing violations of federal law.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and the property that is the subject of the action lies within Delaware County, New York, which falls within the Northern District of New York.

## PARTIES

15.     Plaintiffs Thomas Woodward and Madison Woodward III bring this action as joint mineral estate owners. Together, the Woodwards own 100% of the mineral rights to approximately 164 acres located near Sidney, New York, in Delaware County. In 2019, the Woodwards sold the surface of their property but expressly severed and retained full ownership of the mineral rights.

16.     Defendant Amanda Lefton is the Commissioner of the New York Department of Environmental Conservation (DEC). The DEC is the primary regulatory authority overseeing mineral extraction activities in New York under state law, including issuing or denying permits for oil and gas drilling and enforcing the statewide fracturing prohibition. *See* ECL § 23-0301 *et seq.* Commissioner Lefton is sued in her official capacity only.

17.     Defendant Catherine Dickert is the Director of DEC's Division of Mineral Resources. Defendant Lefton has delegated responsibility for enforcing the laws challenged in this lawsuit to Director Dickert and the Division of Mineral Resources.

6 CRR-NY § 550.2. Director Dickert is sued in her official capacity only.

18.    Defendant Letitia James is the Attorney General of the State of New York. The Attorney General shares enforcement authority for penalties arising from unauthorized drilling and gas extraction under ECL §§ 71-1305, 71-1307. She is sued in her official capacity only.

## FACTUAL ALLEGATIONS

### A.    New York's Marcellus and Utica Shale Formations

19.    New York State sits atop two of the most significant natural gas formations in North America: the Marcellus Shale and the Utica Shale.[1] These formations underlie substantial portions of New York's Southern Tier—including Delaware County, where the Woodwards' property is located.

20.    These formations extend south and west across the border into Pennsylvania, Ohio, and West Virginia, where they have been safely and extensively developed for over fifteen years. Modern technology and the development of high-volume hydraulic fracturing has spurred cost-effective energy production and produced clean natural gas in these regions.[2]

21.    The Utica Shale lies deeper than the Marcellus and underlies much of the same geographic area. Together, the Marcellus and Utica formations represent one of the most valuable concentrations of natural gas resources in the world, and their responsible development has transformed the energy landscape of the states that have permitted it.

22.    High-volume hydraulic fracture stimulation is the only proven commercially viable method of extracting natural gas from the Marcellus and Utica

---

[1] *PennState Marcellus Center for Outreach and Research (MCOR)* (Mar. 2026), https://tinyurl.com/bdezccc3.
[2] Diana Furchtgott-Roth & Andrew Gray, *The Economic Effects of Hydrofracturing on Local Economies: A Comparison of New York and Pennsylvania,* Manhattan Institute for Policy Research (No. 1 May 2013), https://tinyurl.com/46ray8ya.

Shale formations at paying quantities. Unlike conventional reservoirs, these shale formations have extremely low permeability—natural gas is trapped within the rock matrix and cannot flow freely to a wellbore without high-pressure fluid injection in high volume to fracture the surrounding rock and create pathways for gas to escape.[3] Not using high-volume hydraulic fracturing is commercially impracticable and cannot produce natural gas from the Marcellus and Utica Shale formations in paying quantities.

23.    Pennsylvania has demonstrated conclusively, over fifteen consecutive years of active development, that high-volume hydraulic fracturing of the Marcellus and Utica Shale formations is technically feasible, commercially viable, and can be achieved in a way that protects public health and safety.

24.    Thousands of directionally drilled, high-volume hydraulically fractured Marcellus wells have been completed in Pennsylvania, extending in dense clusters through Bradford, Susquehanna, Tioga, and Wyoming Counties—directly adjacent to the New York state line. Some of these wells in Susquehanna County are only approximately twenty-five miles from the Woodwards' mineral estate.

25.    High-EUR (Estimated Ultimate Recovery) wells cluster in Pennsylvania immediately adjacent to the New York border, with the largest recent values attributable to Marcellus horizontal wells that National Fuel Gas/Seneca Resources drilled as recently as 2024.

26.    The same geological formations that Pennsylvania has developed so extensively extend without interruption across the state line into New York's Southern Tier, including into Delaware County, New York.

27.    Post-2015 drilling in Pennsylvania has extended all the way to the New York border, reaching into Susquehanna County, Pennsylvania, adjacent to Broome

---

[3] University of Calgary, *Energy Education-Hydraulic Fracturing* (Apr. 2026). https://tinyurl.com/4hb3b4e9.

County, New York. That development stops abruptly at the state line—not because the geology changes, but because New York's ban makes development on the New York side legally impossible.

28.     The State's own technical record confirms the Subject Mineral Estate's prospectivity. In its Final Supplemental Generic Environmental Impact Statement (SGEIS)—the result of New York's multi-year environmental review of high-volume hydraulic fracturing—DEC mapped Delaware County within the gas-productive fairways of both the Marcellus Shale and the Utica Shale—the portions of each formation identified by the State as most likely to produce natural gas based on geologic and geochemical evaluation—and concluded that these areas would support horizontal drilling and high-volume hydraulic fracturing if permitted.[4]

29.     New York law has historically recognized and encouraged the development of mineral resources. The state's regulatory framework for oil and gas was designed to govern the manner of extraction—well spacing, casing requirements, reclamation standards—not to prohibit extraction altogether.

30.     But rather than develop these natural resources for the benefit of all of society, the State has systematically banned high-volume hydraulic fracturing and effectively made it impossible to develop these resources.

31.     In 2008, Governor Patterson issued a directive to DEC in 2008 to study high-volume hydraulic fracturing under the State Environmental Quality Review Act (SEQRA), which prevented DEC from issuing permits until it completed the review.[5] ECL § 8-0109.

32.     On December 13, 2010, Governor Patterson issued Executive Order

---

[4] *See, e.g.*, DEC, Final SGEIS Executive Summary, at 21 (2015), https://extapps.dec.ny.gov/docs/materials_minerals_pdf/fsgeis2015es.pdf

[5] Press Release, New York State, Executive Chamber, *Governor Paterson signs bill updating oil and gas drilling law; pledges environmental and public health safeguards* (July 23, 2008), https://tinyurl.com/4w8pd5y8.

No. 41. 9 NYCRR § 7.41. It noted that the 2009 state energy plan supported "development of in-State energy resources, including natural gas." *Id.* It then ordered DEC to finish its environmental review of high-volume hydraulic fracturing given that SEQRA prevented permits from issuing during the review. *Id.* And it ordered DEC to report on "regulatory conditions that are necessary to include in oil and gas well permits to protect public health and the environment." *Id.* Governor Cuomo then continued this order on January 1, 2011. 9 NYCRR § 8.2.

33.    In September 2011, DEC issued proposed regulations for high-volume hydraulic fracturing and then revised the proposals in December 2012.

34.    In 2015, DEC finished its environmental review and concluded that it should ban high-volume hydraulic fracturing by refusing to issue permits at all.

35.    In 2020, the legislature later codified this agency decision into a statutory ban. ECL § 23-0501 prohibits issuing permits for an "applicant to drill, deepen, plug back, or convert wells that use high-volume hydraulic fracturing . . . complete or recomplete natural gas or oil resources." It defines "high-volume" as: "the stimulation of a well using three hundred thousand or more gallons of water as the base fluid for hydraulic fracturing for all stages in a well completion, regardless of whether the well is vertical or directional, including horizontal." *Id.*

36.    The 300,000-gallon statutory threshold does not preserve any viable development option—it functions as an outright commercial prohibition. The State's own SGEIS states that a single stage of high-volume hydraulic fracturing "may require 300,000 to 600,000 gallons of water," and that a complete multi-stage well requires 2.4 to 7.8 million gallons total.[6]

37.    While other forms of fracturing exist (such as CO2 and gel propane fracturing), those technologies have not yet proven to be commercially practicable in

---

[6] DEC, SGEIS Ch. 5, at p. 5-87 (2015),
https://extapps.dec.ny.gov/docs/materials_minerals_pdf/fsgeis2015ch5b.pdf

the Marcellus or Utica shale formations.

38.    In any event, the 2020 legislation also imposed an indefinite moratorium on propane gel fracturing, until DEC "completes an analysis of the potential impacts of gelled propane fracturing and makes the analysis publicly available." ECL § 23-0501(3)(b). No such analysis has been initiated, so it remains in effect, and no statutory timeline compels one.

39.    Next, the legislature also banned CO2-based fracturing. § 23-0501(3)(a). In signing that 2024 legislation, which included creating a "Climate Superfund," Governor Hochul issued a press release noting that the legislation's actions are the "Latest Move to Strengthen State's Climate Actions and Environmental Protection Laws to Prevent Harmful Impacts to New Yorkers."[7]

40.    New York imports nearly 85 percent of its energy, a substantial portion of it natural gas from Pennsylvania.[8] New York prohibits extraction within its own borders while purchasing natural gas (that high-volume hydraulic fracturing produced) from its neighbor to meet its energy needs. New York consumers pay the price: the State's residential electricity costs average between 24 and 27 cents per kilowatt-hour—approximately 40 percent above the national average—and natural gas prices run approximately 22.8 percent above the national average.[9]

41.    The economic consequences fall hardest on New York's Southern Tier, where communities sit atop some of the most valuable natural gas reserves in North America, yet state law forbids them from developing them. The ban renders many

[7] Press Release, Gov. Kathy Houchul, *Governor Hochul Signs Landmark Legislation Creating New Climate Superfund* (Dec. 26, 2024), https://tinyurl.com/5t4tkd2j.
[8] U.S. Energy Information Administration, *New York: End-use energy consumption 2023, estimates* (last visited Apr. 9, 2026), https://tinyurl.com/mvb8zpbh.
[9] Mario Loyola, Kevin Dayaratna & Andrew Weiss, *Why Electricity Prices Are Soaring in Blue States*, Heritage Found. (Oct. 23, 2024), https://tinyurl.com/2b7ee6yb;    U.S. Bureau of Labor Statistics, *Average Energy Prices, New York-Newark-Jersey City-December 2024*, https://tinyurl.com/48hsn3k2.

property owners' mineral rights worthless. Local governments forgo substantial tax revenues that could fund schools, roads, and public services. The prosperity that natural gas development has generated just across the state line in Pennsylvania is categorically denied to the communities of Delaware County and the broader Southern Tier by New York's prohibition.

### B.     The Woodwards' Mineral Rights

42.    Plaintiffs Thomas Woodward and Madison Woodward III co-own the mineral estate underlying roughly 164 acres of land near Sidney, New York, in Delaware County.

43.    In July 2011, the Woodwards made a calculated, informed investment decision to purchase the subject property, primarily as an investment in the mineral rights. Madison Woodward III evaluated the property before purchase, analyzing the subsurface geology and production data from comparable shale formations in Pennsylvania. He determined that the property sits in a high-quality "dry gas" zone with significant potential natural gas resources. The Woodwards were informed investors that relied on geological data, an emerging high-volume hydraulic fracturing market, and the legal right to develop their property and its natural resources.

44.    The Woodwards' mineral estate is severed from the surface estate. The Woodwards do not own the surface estate.

45.    As owners of the severed mineral estate, they retain the right to surface access for natural gas extraction purposes that accompanies mineral ownership under New York law. *See Marvin v. Brewster Iron Mining Co.*, 55 N.Y. 538 (1874). The severance of mineral rights from surface rights is a well-established principle of New York property law. When a conveyance of land reserves mineral rights, it creates a legal severance between ownership of the surface and the minerals, giving rise to

two distinct and independently cognizable property estates. *See White*, 78 Misc. 428; *Armstrong*, 147 N.Y. 495.

46.    The subject mineral estate is described in the relevant deed dated May 1, 2019, and recorded in Book 1594, starting on Page 274, Delaware County. The subject property is located at or near 1650 State Hwy. 357, Unadilla, New York 13849, Delaware County (Subject Mineral Estate).

47.    The Subject Mineral Estate lies within the Marcellus Shale productive fairway.

48.    The Marcellus Shale thickens to 600 feet or more in Delaware County, indicating a potentially significant reservoir interval.

49.    The top of the Marcellus at the Subject Mineral Estate is estimated at approximately 3,500 feet below the surface, which shows that the Subject Mineral Estate is within a feasible depth range for commercial development.

50.    The Marcellus shale in Delaware County has the thermal maturity needed for dry-gas generation, given that vitrinite reflectance (Ro) values exceeding 1.3% and are estimated to be on the order of 1.5–3% at the Subject Mineral Estate.

51.    The Marcellus shale in Delaware County has total organic carbon values comparable to values measured in producing Marcellus wells in northeast Pennsylvania, where modern horizontal completions (that used high-volume hydraulic fracturing) have achieved EURs ranging from approximately 5 to 18 Bcf per well depending on completion design and geologic conditions.

52.    These factors all show the Subject Mineral Estate's potential for commercially profitable gas wells that produce gas from the Marcellus Shale formation.

53.    The Subject Mineral Estate also lies within the Utica Shale productive fairway.

54.    The Subject Mineral Estate also falls within the highest-potential portion

11

of the Utica Flat Creek productive fairway as mapped by the State in the SGEIS.

55. The top of the Utica Shale at the Subject Mineral Estate is estimated at approximately 6,000 ft below the surface, approximately the depth range at which the Utica has been commercially developed in eastern Ohio.

56. The total organic carbon values of Utica Shale in the Subject Mineral Estate's region are estimated to be approximately 2.8-3%.

57. These factors all show the Subject Mineral Estate's potential for commercially profitable gas wells that produce gas from the Utica Shale formation.

58. Operators (gas producers) had started leasing properties in Delaware County and nearby counties to start exploring for natural gas before the 2008 de facto moratorium took effect.

59. The opportunity to extract natural gas from two shale formations (Marcellus and Utica) from the same property makes the Subject Mineral Estate especially attractive to operators that would want to lease it for production.

60. The Woodwards purchased the Subject Mineral Estate in 2011 with clear investment-backed expectations that they would be able to develop the natural gas reserves beneath their property. At the time of purchase, no permanent statutory ban on high-volume hydraulic fracturing existed in New York. The 2008 moratorium was represented as temporary and subject to completion of the State's review. The Woodwards reasonably and justifiably expected that lawful development would be permitted upon completion of that review.

61. In 2019, after New York's high-volume fracturing ban (via DEC's 2015 decision) had been in place for five years, the Woodwards sold the surface of the subject property but expressly severed and retained full ownership of the mineral estate. They did so because they retained hope that alternative extraction technologies— including CO2 fracturing or propane gel fracturing—would eventually be permitted and would allow them to develop their mineral estate. Hopes that the

12

State ultimately dashed.

62.    There are no other minerals on the Subject Mineral Estate that can be extracted at commercially profitable amounts.

63.    Natural gas exists thousands of feet underground and cannot be "repurposed" for any alternative use.

64.    There is no commercially profitable market for mineral rights to shale gas resources when state law categorically prohibits every commercially viable extraction method.

65.    Hydraulically fracturing a well at water volume levels below the 300,000 gallon limit that ECL § 23-0501(3)(a) sets on the Subject Mineral Estate is commercially impracticable and would not produce economic quantities should the Woodwards lease the minerals to an operator.

66.    Contemporary Marcellus and Utica gas wells in the region use millions of gallons of water during the well completion process, far exceeding 300,000 gallons.

67.    Gas wells drilled in New York with conventional methods to access the Marcellus shale (i.e., not using high-volume hydraulic fracturing) only produced 544 million cubic feet (MMcf) between 1967 and 1999, and only about thirty-four MMcf from about fifteen wells in 2010. This is far below the levels needed for the well to become commercially practicable when nearby Marcellus gas wells in Pennsylvania and Utica wells in Ohio have EURs averaging approximately 8-13 billion cubic feet (bcf).

68.    Drilling for natural gas or fracturing on the Subject Mineral Estate without a permit, or using any method that New York law bans carries civil and criminal penalties under ECL §§ 23-0305, 71-1305, 71-1307.

69.    There are no exceptions to New York's comprehensive fracturing ban that would allow for the drilling of new gas wells that use high-volume hydraulic fracturing, $CO_2$ fracturing, or propane gel fracturing on the Subject Mineral Estate.

13

70.    But for New York's comprehensive ban, the Woodwards would lease the property to an operator interested in developing the Subject Mineral Estate for natural gas production purposes.

71.    The Woodwards hope to enjoy the benefits of natural gas production from their mineral estate consistent with the successful development of the same Marcellus and Utica shale formations in nearby Pennsylvania counties.

## CAUSE OF ACTION

### Violation of the Fifth and Fourteenth Amendments to the U.S. Constitution

### U.S. Const. amends. V, XIV and 42 U.S.C. § 1983

72.    Plaintiffs re-allege each and every allegation contained in the preceding paragraphs as though fully set forth herein.

73.    The Fifth Amendment to the U.S. Constitution, made applicable to the States by the Fourteenth Amendment, prohibits the government from taking "private property . . . for public use, without just compensation." U.S. Const. amend. V.

74.    The U.S. Supreme Court has held that a regulation that "goes too far" in depriving a property owner of the productive use of their property constitutes a taking under the Fifth Amendment for which the government must pay just compensation. *Pa. Coal Co.*, 260 U.S. at 415.

75.    A regulation goes too far when it "deprives *all* economically beneficial use[]" of a property. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014, 1019 (1992).

76.    A regulation also "goes too far" when it deprives a severed mineral estate of any beneficial use by making it "commercially impracticable" to extract the minerals. *Pa. Coal Co.*, 260 U.S. at 414–15. Indeed, making it commercially impracticable to develop natural resources "has very nearly the same effect for constitutional purposes as appropriating or destroying it." *Id.*

14

77. New York law has long recognized mineral rights as a separate and independent estate from the surface estate. *White*, 78 Misc. 428; *Armstrong*, 147 N.Y. 495. The Woodwards' mineral estate is a discrete property interest, severed from the surface, conveyed and taxed independently of the surface estate.

78. New York's comprehensive fracturing ban eliminates the only commercially viable method (high-volume hydraulic fracturing) of extracting natural gas from the Marcellus and Utica Shale formations (and therefore the Subject Mineral Estate). Thus, the ban makes natural gas extraction commercially impracticable for the Woodwards.

79. Thus, the ban and Defendant State officials' enforcement of it have appropriated and destroyed all economic uses of the Woodwards' severed mineral estate and effectuates a taking as a result.

80. New York's comprehensive fracturing ban is not a background legal restriction on the use of the Woodwards' property. New York law has long recognized the right to extract minerals from one's property and has historically encouraged development of natural resources. *See Marvin*, 55 N.Y. 538 (1874).

81. "A property owner has an actionable Fifth Amendment takings claim when the government takes his property without paying for it." *Knick v. Twp. of Scott*, 588 U.S. 180, 185 (2019). New York's ban on all forms of high-volume hydraulic fracturing and CO2 fracturing is categorical, statewide, and contains no exception, variance, or waiver procedure that would permit the Woodwards to develop their mineral estate. Defendants' enforcement of the ban has taken all economically beneficial use of the Woodwards' severed mineral estate.

82. The moratorium on gel propane fracturing likewise has no exceptions, variances, or waivers while DEC completes its study, which, six years later, is still not complete and is, thus, a permanent ban. It too effects a taking of the Woodwards' mineral estate by destroying all economic use under *Lucas*, or alternatively, under

15

*Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

83.    Neither New York nor the Defendants have paid the Woodwards just compensation for the taking of their mineral estate. Therefore, Plaintiffs have an actionable federal takings claim against Defendants under 42 U.S.C. § 1983.

84.    Whatever environmental or policy benefits New York believes it derives from prohibiting natural gas extraction, the Woodwards' property rights cannot be sacrificed without the State paying them just compensation. *Lucas*, 505 U.S. at 1019 ("We think, in short, that there are good reasons for our frequently expressed belief that when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking."); *Pa. Coal Co.*, 260 U.S. at 416. New York cannot avoid its constitutional obligation by regulating mineral rights out of existence rather than formally condemning them through eminent domain.

85.    Defendants are state actors who cannot be sued for damages in federal court. Plaintiffs thus lack an adequate remedy at law and seek prospective injunctive and declaratory relief under *Ex parte Young*, 209 U.S. 123 (1908). *See also Cedar Point Nursery v. Hassid*, 594 U.S. 139, 179 (2021) (Breyer, J., dissenting) (noting that the victorious property owners in *Cedar Point* sought only injunctive and declaratory relief and arguing that the State "should have the choice of foreclosing injunctive relief by providing compensation").

86.    The Woodwards suffer ongoing irreparable injury each day that enforcement of New York's ban on high-volume hydraulic fracturing, CO2 fracturing, and gel propane fracturing continue.

87.    The balance of the hardships weighs in favor of enjoining enforcement of New York's ban.

88.    The public interest weighs in favor of enjoining New York's ban.

## PRAYER FOR RELIEF

Plaintiffs seek the following relief:

A.    A declaratory judgment that New York's comprehensive ban on all forms of high-volume hydraulic fracturing, CO2 fracturing, and gelled propane fracturing, on its face and as applied, violates the Fifth Amendment to the U.S. Constitution;

B.    A permanent injunction against Defendants, their officers, employees, agents, assigns, and all persons acting in concert with them, directing them to stop enforcing New York's ban on these fracturing methods;

C.    An award of attorneys' fees and costs in this action pursuant to 42 U.S.C. § 1988; and

D.    An award of any further relief this Court may deem just and proper.

Dated: April 16, 2026.              Respectfully submitted,

*/s/ David McDonald*
David McDonald
NY Bar No. 5539424
Jeffrey D. Jennings*
VA Bar No. 87667
Tyler Fry*
TX Bar No. 24136831
PACIFIC LEGAL FOUNDATION
3100 Clarendon Blvd, Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Fax: (916) 419-7747
Email: dmcdonald@pacificlegal.org
        JJennings@pacificlegal.org
        TFry@pacificlegal.org

*\* Mailing address only. Pro hac vice motion forthcoming.*

17